STEPHANIE YONEKURA
Acting United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
SUSAN J. DE WITT (Cal. Bar No. 132462)
Acting Executive Assistant U.S. Attorney
CHRISTOPHER D. GRIGG (Cal. Bar No. 220243)
Deputy Chief, National Security Section
ALLEN W. CHIU (Cal. Bar No. 240516)
Assistant United States Attorneys
National Security Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-4496/5429
     Facsimile: (213) 894-6436
     E-mail: susan.dewitt@usdoj.gov
             christopher.grigg@usdoj.gov
             allen.chiu@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>SOHIEL OMAR KABIR, et al.,<br><br>                    Defendants. | ED No. CR 12-00092(B)-VAP<br><br>GOVERNMENT'S POSITION REGARDING SENTENCING FOR DEFENDANT SOHIEL OMAR KABIR<br><br>Hearing Date: February 23, 2015<br>Hearing Time: 9:00 a.m.<br>Place: Courtroom of the Honorable Virginia A. Phillips |

     The United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California, and undersigned counsel, hereby submits its position regarding sentencing for defendant Sohiel Omar Kabir.

     The government's position regarding sentencing is based on the evidence admitted at trial, the jury's verdicts, the United States

Probation Office's Presentence Investigation Report ("PSR"), Revised PSR, First Addendum to the PSR, sentencing recommendation letter, and revised sentencing recommendation letter, the files and records in this case, and any such additional argument or evidence the Court may allow.

Dated: February 9, 2015            Respectfully submitted,

                                   STEPHANIE YONEKURA
                                   Acting United States Attorney

                                   ROBERT E. DUGDALE
                                   Assistant United States Attorney
                                   Chief, Criminal Division


                                   _____/s/_____
                                   SUSAN J. DE WITT
                                   CHRISTOPHER D. GRIGG
                                   ALLEN W. CHIU
                                   Assistant United States Attorneys
                                   National Security Section

                                   Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION**

On September 25, 2014, following a six-week jury trial, defendant Sohiel Omar Kabir ("Kabir") was convicted of several counts of conspiracy as charged in the Second Superseding Indictment ("SSI").  Specifically, Kabir was convicted of: conspiring to provide material support to terrorists in violation of 18 U.S.C. § 2339A (Count One); conspiring to provide material support and resources to Al-Qa'ida, a designated foreign terrorist organization ("FTO") in violation of 18 U.S.C. § 2339B (Count Two); conspiring to receive military-type training from Al-Qa'ida in violation of 18 U.S.C. § 371 (Count Four); and conspiring to kill officers and employees of the United States Government in violation of 18 U.S.C. § 1117 (Count Five).  Kabir was acquitted of one count in the SSI, namely, conspiring to commit murder, kidnapping, or maiming overseas in violation of 18 U.S.C. § 956(a) (Count Three).

As evidenced by the convictions, Kabir was convicted of the most serious federal offenses, including conspiring to commit murder, providing material support to terrorists, and receiving military-type training from Al-Qa'ida.  The evidence introduced at trial, which included numerous recordings of Kabir's statements and his social media posts, demonstrated his intent to join the Taliban and Al-Qa'ida and to <u>kill</u> U.S. military and other personnel.  As a result of the convictions, Kabir faces a statutory maximum penalty and advisory guidelines sentence of life imprisonment, which is the "starting point and the initial benchmark" that is to be kept in mind throughout the sentencing process.  <u>United States v. Carty</u>, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

Here, in determining the appropriate sentence, Kabir's role and participation in the conspiracy simply cannot be overstated.  Kabir was the genesis and impetus for the group's plan to travel overseas, join a terrorist group and commit murder and other acts of violence against U.S. military and other personnel.

Indeed, as the evidence at trial established, Kabir was responsible for converting two of the co-defendants to Islam, namely, Ralph Kenneth Deleon ("Deleon") and Miguel Alejandro Santana Vidriales ("Santana"), and he introduced them to violent and radical Islamic extremist views.  These views included an interpretation of Islam espoused by the radical cleric Anwar Al-Awlaki and other terrorist leaders, who called for violent jihad against the West, particularly against the United States, as a means to retaliate for its perceived treatment of Muslims in foreign lands.

At or near the time Kabir converted Deleon and Santana to Islam, he encouraged them to travel overseas to engage in violent jihad. This encouragement increased when Kabir departed the United States for Afghanistan in 2011.  Kabir also assisted in recruiting others into the conspiracy, including Arifeen Gojali ("Gojali").

Moreover, throughout the conspiracy, Kabir continued to encourage the group to join him in Afghanistan, including by telling them about his connections to the Taliban and Al-Qa'ida, discussing his physical preparations for fighting and warfare, and various "missions" and operations he was asked by terrorists to participate in (including a suicide mission involving explosives), advising and assisting with travel plans, and discussing living arrangements for the group when they arrived in Afghanistan.

As the plans for the U.S.-based co-defendants to depart the United States solidified, Kabir instructed the group on how to pack, including asking Deleon to bring his U.S. military uniforms (further demonstrating an intent to kill U.S. military personnel), and an X-box to direct unwanted attention away from their true intentions, which was to fight and kill.  In addition, Kabir instructed the co-defendants to prepare themselves for fighting in Afghanistan by exercising specific parts of the body to build the strength necessary to carry weapons and the wounded from the battlefield and by training with assault-rifles, which, again, they did for the purpose of joining the Taliban and Al-Qa'ida and killing others, including U.S. and other military personnel.  Put simply, Kabir was involved in all aspects of the group's plans.

The seriousness of the offenses and the substantial role Kabir played in the conspiracy militate heavily in favor of a significant sentence here.  Further, Kabir's prior offenses, which span a period of over 10 years and include approximately 11 convictions, demonstrate a continued disregard for the law.  Kabir's disregard for the law continued even after he was arrested on the charges for which he was convicted.  While Kabir was awaiting trial in this case, he sustained multiple disciplinary actions against him by the Bureau of Prisons ("BOP"), including for assault on an inmate, unauthorized use of the telephone and mail abuse.

The appropriate sentence in this case needs to adequately reflect the seriousness of the offenses, Kabir's pivotal role in the offenses, to afford just punishment and to promote respect for the law.  A substantial sentence is also needed to deter individuals like Kabir, who may sympathize with extremist views or hold real or

perceived grievances of their own from embracing and contemplating acts of violence, as Kabir and the co-defendants were intent on doing here.

Accordingly, as set forth below, in considering the factors under 18 U.S.C. § 3553(a), the government respectfully submits that the appropriate sentence in this case is 420 months' imprisonment (35 years), followed by a lifetime of supervised release and a mandatory special assessment of $400. This sentence, which the United States Probation Office ("USPO") agrees with, is well below the statutory maximum sentence and the advisory guidelines range of life imprisonment and is sufficient but no greater than necessary to comply with the factors set forth in 18 U.S.C. § 3553(a).

## II.   <u>THE OFFENSE CONDUCT</u>

The government agrees with, and requests that the Court adopt the statement of offense conduct set forth in the USPO's Presentence Investigation Report ("PSR") and Revised PSR ("R-PSR"). <u>See</u> PSR, R-PSR ¶¶ 9-21. Because the Court is familiar with Kabir's and the co-defendants' conduct in this case, including the evidence admitted at trial, the facts of this case are only partially recounted here.

In 2010, Kabir influenced Deleon and Santana to convert to Islam and introduced them to radical and violent Islamic doctrine. Santana explained to the Confidential Source ("CS") in a recording dated July 5, 2012, that he had expressed to Kabir an interest in joining the U.S. armed forces, and Kabir responded that the military are the "terrorists" who were oppressing people. (Exhibit 593). At that time, Kabir introduced Santana to Anwar Al-Awlaki and encouraged him to join the "other side" where "they are fighting for something . . . a worthy cause." (<u>Id.</u>)

1    Kabir's encouragement had an immediate and profound impact on

2  Santana, as evidenced in a conversation Santana had with the CS on

3  September 20, 2012.  Santana explained that he "literally just came

4  to Islam like strictly with fisabiallah."[1]  (Exhibit 656).  Deleon

5  had a similar conversation with the CS the same day, in which Deleon

6  explained that it was Kabir who encouraged him to go overseas.

7  (Exhibit 665).

8    In a subsequent conversation with the CS, Deleon recounted that

9  Kabir said "if it wasn't for Islam, I would have already killed so

10  much (sic) people, but now, I know which people that I want to like

11  take out."  (Exhibit 655).  When Santana told Deleon that he finally

12  found a group he belonged to and that he had found something worth

13  fighting for, Deleon responded that it was the "only thing worth

14  fighting for."  (Exhibit 654).  Thus, as evidenced in the recordings,

15  Kabir introduced Deleon and Santana to radical Islamic views and

16  encouraged them to act on those views by traveling overseas to fight

17  from the very beginning.

18    After introducing Deleon and Santana to radical Islamic views,

19  on December 28, 2011, Kabir traveled from the United States to

20  Germany, where he remained until July 2012, when he relocated to

21

22

23  _____

24    [1] As evidenced by the communications between the co-defendants
   and also, as explained by the government's expert witness, Evan
25  Kohlmann, when used in the context of this case and the evidence
   introduced at trial, the term "fisabilallah" meant violent jihad.
26  (See Exhibit 571 (Deleon and Santana discuss the concept espoused by
   Anwar Al-Awlaki that fisabillah is mandatory, and that the only way
27  they are going to be victorious is by the sword."); 9/9/2014 AM
   Session RT at 23).

28

Afghanistan.[2]   (8/26/14 AM Session RT at 99-100.)   Thereafter, in February 2012, the CS met Deleon and Santana.   Deleon, Santana and the CS discussed radical Islamic views and later, in May of 2012, Deleon informed the CS of their plan to travel overseas to engage in violent jihad and invited him to join them.

In conversations with the CS, Deleon and Santana discussed potential targets for violent attacks overseas, including American military personnel and bases.   Deleon and Santana made numerous statements to the CS regarding their intention to join Kabir in Afghanistan and to engage in violent jihad.   (Exhibits 580, 605, 655).   For instance, during a conversation on July 11, 2012, Deleon said that he wanted to be on the front lines or use explosives and Santana said that he wanted to be a sniper.   (Exhibit 583).   During another conversation on July 11, 2012, Santana told the CS that there were Al-Qa'ida camps in Afghanistan and that he wanted to join Al-Qa'ida because there were "more targets."   (Exhibit 600).

While in Afghanistan, Kabir continued to communicate with Deleon and Santana and encouraged them to join him in Afghanistan to engage in violent jihad.   Specifically, in a recording on August 8, 2012, Deleon told the CS that he skyped with Kabir and Kabir said he "loves it in Afghanistan" and encouraged Deleon to "come on down."   (Exhibit 609).   During that same conversation, to further encourage Deleon to join him in Afghanistan, Kabir said there were several people who wanted to go fight and the "mujahid" were begging to be picked for "operation[s]."   (Id.)   Kabir had a similar conversation with Santana

---

[2]   Although Kabir left for Afghanistan in 2011, the evidence at trial established that he had an interest in traveling to Afghanistan since at least 2008.   (See 9/10/14 PM Session RT at 14.)

a few weeks later, on August 26, 2012, when Kabir sent Santana an email that said "everything's set up for you guys out here.  Now you just gotta come."  (8/20/14 PM Session RT at 66.)

On August 31, 2012, Kabir told Deleon and Santana during a Skype call that he made contacts in Afghanistan and that upon their arrival, they would join the "Students," referring to the Taliban, and then would advance to join the "professors," referring to Al-Qa'ida.  (Exhibit 621).  During that conversation, Deleon asked Kabir whether it would be a problem for the co-defendants because they were coming from the United States.  Kabir responded, "No, no.  Cause I'll be here."  Kabir then re-assured the group that he already told the "brothers about you guys coming through" and they said, "bring 'em down man."  (Id.)

Shortly after that Skype call, in a separate conversation that same day, Deleon told the CS that they would be with the Taliban and afterwards they would join "AQ."  (Exhibit 622).

Throughout the conspiracy, Kabir and the co-defendants made clear, through social media posts and both verbal and written communications, that they intended to fight and kill American and allied troops that oppressed Muslims and occupied Muslim lands.  At trial, the government introduced numerous Internet postings and videos from Kabir's facebook page that demonstrated his intent to engage in military training and commit acts of violent jihad, including killing U.S. military and other personnel, such as: (1) a video posted on Kabir's Facebook page in July 2012, entitled "Daily Life of a Majahid 7," which celebrated the martyrdom of an individual who drove a vehicle with explosives into a military base in Afghanistan (Exhibit 88); and (2) a video posted on Kabir's Facebook

Page in January 2012, the Du'a of Sheikh Mohaisany, which Kabir labeled a "powerful prayer" (which Deleon liked), that was a recording of a prayer released around the time of the invasion of Iraq that called for Allah to destroy the United States.  That video depicts, among other things, mujahideen fighters operating in active battles, the twin towers being attacked and battles that appear to be in the Middle East and Afghanistan and elsewhere.  (Exhibit 224).

In September 2012, Deleon recruited co-defendant Gojali to join the conspiracy to travel overseas and engage in violent jihad against Americans and others.  Kabir had a role in recruiting Gojali into the conspiracy.  Notably, in an email dated October 4, 2012, Deleon asked Kabir whether he should invite Gojali into the group.  Kabir responded, "if that brother has the same intentions . . . let him roll too . . . ."  (Exhibit 354).

At trial, Gojali testified that, when he joined the group, the group planned to join Kabir in Afghanistan and to fight.  (8/27/14 AM Session RT at 89-90.)  Gojali also testified that the group intended to go out and fight American, British, and Australian soldiers and U.N. Forces.  (Id. at 90.)  Gojali was informed that Deleon was elected as the "emir" or leader of the group.  (Id. at 92.)  However, the plan was that once the group arrived in Afghanistan, Kabir would be the emir.  (Id.)

In the few months preceding their arrest in November 2012, Deleon, Santana and Gojali continued to communicate with Kabir as they discussed their plans to meet Kabir in Afghanistan.  Kabir was involved in all aspects of the group's plans to travel to Afghanistan to join the Taliban and Al-Qa'ida and to kill U.S. military and other personnel.  Kabir advised them of routes to travel to Kabul.

1   (Exhibit 519).  He discussed arranging an apartment for the group to

2   stay when they arrived in Afghanistan.  (Exhibit 522, 528, 535;

3   8/27/14 PM Session RT at 14).  Kabir also informed them he had made

4   arrangements to join the Taliban and he had contacts with Al-Qa'ida.

5   (Exhibits 525, 526, 535).  He encouraged them to train and prepare

6   for jihad.  (Exhibits 516, 669 516).  Kabir also instructed them on

7   how to pack and asked them to bring specific items to Afghanistan,

8   including his U.S. military uniforms and an X-box.  (Exhibit 540).

9       While they were in the United States, Deleon, Santana and Gojali

10  took steps to prepare for their intended travel to Afghanistan,

11  including participating in physical exercise, paintball activities,

12  and training with M16 and AK-47 assault rifles and other firearms at

13  firing ranges.  (8/27/14 PM Session RT at 101-106).  Gojali testified

14  that Deleon said going to paintball was good training and would be

15  the closest thing to live combat.  (Id. at 102).  At the firing

16  range, Deleon selected the AK-47 assault rifle for Gojali to train

17  with because it was the rifle that would be used when they traveled

18  overseas.  (Id. at 106.)  Gojali stated that, when he left on

19  November 16, 2012, he intended to use an AK-47 to kill American

20  soldiers overseas.  (Id. at 55.)

21      In addition, Deleon, Santana and Gojali obtained valid passports

22  in order to travel to Afghanistan.  In July 2012, Santana renewed his

23  Mexican passport.  In November 2012, Gojali obtained a United States

24  passport.  In order to raise money for their travel, Deleon withdrew

25  from college, obtained a refund of his tuition money and sold his

26  car.

27      A few weeks before the co-defendants' attempted departure from

28  the United States, during a call on November 6, 2012, Kabir informed

9

1   Deleon he was leaving on a "one-way trip" and that a person would be
2   waiting at the airport in Kabul to meet Deleon and the others upon
3   their arrival.  (Exhibit 548).  When Deleon asked whether Kabir's
4   trip involved the third letter of the alphabet and the fourth number
5   (referring to C4, an explosive), Kabir responded "Inshallah" (Arabic
6   for "God willing") and explained that he was given the choice.  (<u>Id.</u>)

7        Thereafter, in November 2012, Deleon, Santana, and Gojali
8   purchased airline tickets to fly from Mexico City to Istanbul,
9   Turkey.  Deleon asked an individual to drive them to Mexico and told
10  the individual that he would receive heavenly rewards for aiding
11  Deleon and the others.  On November 16, 2012, the FBI arrested
12  Deleon, Santana and Gojali in a car as they were departing an
13  apartment in Chino, California, intending to drive to Mexico.  After
14  co-defendants were arrested, United States military personnel
15  captured Kabir in Afghanistan and later relinquished him to the FBI
16  pursuant to an arrest warrant issued in this case.

17  **III. <u>SENTENCING ANALYSIS</u>**

18       When fashioning a sentence, the court must consider the
19  statutory factors set forth in 18 U.S.C. § 3553(a) in light of the
20  "totality of circumstances" relating to the crime and the defendant.
21  <u>United States v. Reyes</u>, 764 F.3d 1184, 1198 (9th Cir. 2014) (quoting
22  <u>United States v. Carty</u>, 520 F.3d 984, 993 (9th Cir. 2008) (en banc)).
23  The court must begin by correctly calculating the applicable
24  sentencing range under the United States Sentencing Guidelines,
25  which, although advisory, is "the starting point and the initial
26  benchmark" that is "to be kept in mind throughout the process."
27  <u>Carty</u>, 520 F.3d at 991 (internal quotation and citation omitted).
28  After considering the parties' arguments, the court must then

1    determine whether a departure or variance is warranted and, if so, to

2    what extent.  Id.

3         As discussed below, no departure or variance is warranted here

4    other than the government's recommended term of 420 months'

5    imprisonment (35 years).  The government submits that this sentence

6    is no greater than necessary to reflect the seriousness of Kabir's

7    offenses, promote respect for the law, provide just punishment,

8    afford adequate deterrence and protect the public.

9         **A.   The Guidelines Calculations**

10        The government agrees with, and requests that the Court adopt,

11   the USPO's guidelines calculations as stated in its first PSR, see

12   PSR ¶¶ 25-41, which include the following base offense levels:

13        Count One, 18 U.S.C. § 2339A: Level 38  USSG §§ 2X2.1, 2A1.2

14        Count Two, 18 U.S.C. § 2339B: Level 26  USSG § 2M5.3

15        Count Four, 18 U.S.C. § 371: No Guideline Calculation

16        USSG §§ 2X1.1, 2X5.1

17        Count Five, 18 U.S.C. § 1117: Level 33  USSG § 2A1.5

18        Because Kabir and co-defendants intended to kill, and provide

19   material support to the killing of, American and allied forces, the

20   government does not object to the USPO's recommended grouping of the

21   offenses in this case.  See PSR ¶ 25, R-PSR ¶ 25.[3]  Accordingly,

22   under USSG § 3D1.3(a), the base offense level is derived from Count

23   One.  See PSR ¶¶ 26-27, R-PSR ¶¶ 26-27.

24        The USPO properly assesses that, given Kabir's role as an

25   organizer and leader in the plot, both discussed above and

26

27        [3] The government submits that such grouping may not be
     necessarily appropriate in other cases involving similar counts of
28   conviction.

                                    11

extensively at trial, a two-level increase is warranted under USSG § 3B1.2(c).  See PSR ¶¶ 35-38, R-PSR ¶¶ 34-36.

Lastly, the USPO correctly recognizes that a 12-level increase under USSG § 3A1.4 applies in this case.  See PSR ¶ 34, R-PSR ¶ 33. As a result, the USPO initially found that the adjusted total adjusted offense level is 52.  See PSR ¶ 40.  The USPO later found in the revised PSR that the total adjusted offense level is 47.  R-PSR ¶ 38.  Although paragraph 31 of the revised PSR correctly recites the guidelines provisions applicable to the underlying predicate offenses, including the fact that USSG § 2A1.2 is among the provisions applicable to a violation § 2332(a) (one of the predicates here), the paragraph nonetheless concludes that the lesser provision, USSG § 2A1.5, applies.  See R-PSR ¶ 29.  The revised PSR thus does not account for the § 2332(a) predicate or explain why it does not.

The revised approach, which relies on § 2A1.5, is not appropriate here.  If the § 2339A conspiracy charged in Count One had as its only predicate a violation of § 2332(a) (i.e., a conspiracy to provide material support in furtherance of killing), USSG § 2A1.2 would apply.  The fact that § 2332(a) is not the only predicate does not justify ignoring it, especially when it remains the most serious offense.

In any event, the government agrees, and requests that the Court find, that the total adjusted offense level is the same regardless of whether § 2A1.2 or § 2A1.5 controls.  Under either provision, the resulting offense level is higher than the highest level in the sentencing table (level 43); see PSR ¶¶ 40-43; R-PSR ¶¶ 38-41; and thus, must be artificially reduced to level 43.  See USSG Ch. 5, Part A, comment n.2; PSR ¶ 43; R-PSR ¶ 41.  By operation of USSG § 3A1.4,

1  Kabir's criminal history category is VI.  <u>See</u> R-PSR at 4, R-PSR ¶ 60.

2  Accordingly, Kabir's guidelines sentencing range is life.[4]

3         1.   <u>The Terrorism Enhancement Applies To All Counts</u>

4       The government agrees with the probation officer that the

5  terrorism enhancement in USSG § 3A1.4 applies in this case, <u>see</u> R-PSR

6  ¶ 33, not only to the offense resulting in the most serious

7  guidelines range, but to all offenses.  Section 3A1.4 applies to

8  felonies that involved, or were intended to promote, a federal crime

9  of terrorism.  USSG § 3A1.4.  For purposes of the enhancement, a

10 "federal crime of terrorism" means: (a) an offense calculated to

11 influence or affect the conduct of government by intimidation or

12 coercion, or to retaliate against government conduct; and (b) is

13 listed in 18 U.S.C. § 2332b(g)(5).  USSG § 3A1.4, comment n.1; 18

14 U.S.C. § 2332b(g)(5).

15            *a.   Each Count Involved Or Was Intended to Promote A*
                *§ 2332b(g)(5) Offense*
16

17      Each of Kabir's counts of conviction involved or was intended to

18 promote terrorism offenses enumerated in § 2332b(g)(5), namely,

19 violations of § 2339A, conspiracy to provide material support to

20 terrorists (Count One); § 2339B, conspiracy to provide material

21 support to a FTO (Count Two); § 371, conspiracy to receive military-

22 type training from, and on behalf of Al-Qa'ida (Count Four); and

23 § 1117, conspiracy to murder officers and employees of the United

24 States (the crime Kabir conspired to commit in Count 5).  <u>See</u> 18

25 U.S.C. § 2332b(g)(5).

26 _____

27      [4] The range would be the same even if Kabir's criminal history
   category was category V, which is based on 11 prior convictions
28 spanning the period of 1996 to 2006.  R-PSR ¶¶ 47-57.

b.   *Each Offense Was Intended to Influence, Affect,*
*Or Retaliate Against Government Conduct*

To satisfy the first prong of the "federal crime of terrorism" definition, the evidence need only prove[5] that the *offense* was calculated to influence or affect government conduct by intimidation or coercion, or to retaliate against government conduct.   Application of § 3A1.4(a) does not require a finding that the defendant was *personally* motivated by a desire to influence or affect the conduct of government, or to retaliate against government conduct.   See United States v. Awan, 607 F.3d 306, 316-318 (2d Cir. 2010) (the government need not show defendant was personally motivated to influence government if it shows that he intended to promote a crime calculated to have such an effect); United States v. Jayyousi, 657 F.3d 1085, 1114-15 (11th Cir. 2011) (holding that the first prong of USSG § 3A1.4(a) focuses on the "the intended outcome of the

_____

[5] "The preponderance of evidence standard is generally the appropriate standard for factual findings used at sentencing." United States v. Felix, 561 F.3d 1036, 1045 (9th Cir. 2009). However, in the Ninth Circuit, "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction, the government may have to prove the factor by clear and convincing evidence.   Id. (internal quotation marks and citations omitted).   The government recognizes that under current Ninth Circuit law, it must prove the application of USSG § 3A1.4 by clear and convincing evidence.   See United States v. Tankersley, 537 F.3d 1100, 1106 & n.5 (9th Cir. 2008)(assuming, without deciding, that "clear and convincing" standard of proof applies to determination of facts underlying application of USSG § 3A1.4); United States v. Thurston, 2007 WL 1500176, *19 (D. Or. 2007)(finding that "clear and convincing" standard of proof applies to determination of facts underlying application of USSG § 3A1.4).   The government submits that it has done this.   However, for purposes of preserving its position on appeal, and due to the circuit split on this issue, the government argues that the standard of proof for all sentencing factors should be proof by a preponderance of the evidence.   See, e.g., United States v. Graham, 275 F.3d 490, 517 n.19 (6th Cir. 2001)(holding that preponderance of evidence standard of proof applies to determination of facts for application of USSG § 3A1.4).

defendant['s] unlawful acts - <u>i.e.</u>, what the activity was calculated to accomplish, not what the defendant['s] claimed motivation behind it was . . . . [d]efendant's motive 'is simply not relevant.'"); <u>accord</u> <u>United States v. El-Mezain</u>, 664 F.3d 467, 571 (5th Cir. 2011) (citing with approval both <u>Awan</u> and <u>Jayyousi</u>); <u>see also</u> <u>United States v. Chandia</u>, 675 F.3d 329, 340-341 (4th Cir. 2012) (affirming application of terrorism adjustment where the court reasonably inferred that the defendant intended to advance the terrorist organization's purpose based on the defendant's knowledge about the terrorist organization).

Here, considerable evidence shows that Kabir subscribed wholeheartedly to the extremist ideology of Al-Awlaki and other terrorist leaders who espoused violent jihad against the West, particularly against the United States, as a means to retaliate against the United States for its perceived treatment of Muslims. Indeed, the evidence introduced at trial established that as early as 2005, Kabir had in his possession documents containing extremist ideologies calling for violent jihad against the West.

At trial, the government introduced testimony from FBI Special Agent Jeffrey Stiff, who assisted in the search of Kabir's residence. (8/14/14 PM Session RT at 83-84). During the search, SA Stiff found in a shoe box containing other documents belonging to Kabir approximately a dozen documents from the extremist Internet website "Jihad Unspun." (<u>Id.</u> at 98-99). One of the pages from the documents included the following passage:

> When the Americans hear the Mujahideen cries of "Allah Akbar" (God is Greatest) and "labiak alahuma labiak" (I am here, oh God, I am here), they shiver with fear even before they get to them from 300 meters away. Let me tell you something. Sometimes I used to rejoice within myself when

> I saw Mujahaideen butchering and killing lots of them, the Americans, because there's nobody who prefers an American over an Iraqi or Arab Muslim.

(Id.)

Moreover, as the evidence at trial established, Kabir introduced Deleon and Santana to Anwar Al-Awlaki and his radical ideologies calling for violent jihad against the west.  For example, in a July 5, 2012 recording, Santana explained to the CS that, after Kabir had told him the military are the "terrorists" who were oppressing people, Kabir introduced Santana to Al-Awlaki and encouraged him to join the "other side" where "they are fighting for something . . . a worthy cause."  (Exhibit 593).  Kabir had a similar conversation encouraging Deleon to go overseas and fight when Kabir converted him to Islam.  (Exhibit 665).

At trial, Mr. Kohlmann testified extensively about the context of the jihadi movement that Kabir sought to join and the movement's antipathy toward the United States and its allies.  (9/9/14 RT AM Session at 21-24).  That context leaves no doubt as to the intended effect of Kabir's and the co-defendants' conduct in this case.

The extensive propaganda circulated by the defendants included the teachings of key figures in the global jihadi movement such as Sheikh Abdullah Azzam, the godfather of contemporary violent jihad, who taught that the United States is the enemy of the jihadi movement and should be fought.  (See, e.g., Exhibit 386 (an image of Azzam posted by Deleon with the quote "Death is only but once, so let it be in the path of Allah."); 9/5/14 RT PM Session at 69-72).  Kohlmann also discussed the history of violent movements like the Taliban and Al-Qa'ida, in their efforts to fight against Soviet, and later American, occupation of the historically Muslim country of

Afghanistan.  (9/5/14 RT PM Session 77-85).  Kohlmann also noted that the United States military has remained in Afghanistan since the invasion of 2001, id. at 84, about which Kabir posted (and Deleon liked) reporting of updates by the Taliban about its fight against the U.S. and others.  (See, e.g., Exhibits 207 (at 19) and 200 (at 8)).

Kohlmann explained that the invasion of Iraq by the United States and its allies in 2003 and 2004 lent credibility to jihadists' rhetoric and that they used images from the war, such as at Abu Ghraib, as recruiting tools to encourage individuals to fight. (9/5/14 RT PM Session at 27-29).[6]  Further, Kohlmann testified that a video posted on Kabir's Facebook Page in January 2012, the Du'a of Sheikh Mohaisany, which Kabir labeled a "powerful prayer" and which Deleon liked, featured graphic images of the 9/11 attacks on the World Trade Center and photos of U.S. leaders with an audio recording of a prayer released soon after the invasion of Iraq literally calling for God to destroy the United States.  (9/5/14 RT PM Session at 27; Exhibits 224, 493).  The invasion of Iraq resulted in a wave of jihadi fighters going to the Middle East to join the fighting. (Id. at 29).  This is the movement that Kabir and his co-defendants planned to join.

The doctrine of Al-Awlaki is particularly instructive.  Al-Awlaki taught that, like his brothers in Al-Qa'ida, he came to the conclusion that violent jihad is obligatory upon all Muslims. (9/9/14 RT AM Session at 33-34; see Exhibit 234).  Kohlmann also

---

[6] Dr. Sageman's testimony was similar.  (See 9/10/14 RT AM Session 66-70).

testified that Al-Awlaki posted materials condemning Muslims for voting in the American presidential election and ordered Muslims never to vote and instead to participate in violent jihad. (9/5/14 RT PM Session at 98-100). According to Al-Awlaki, it would be difficult to engage in jihad without first making hijrah (emigrating) to Muslim lands and that the concepts are closely intertwined and cannot be separated. (9/9/14 RT AM Session at 34-35).

Kohlmann testified about additional works by Al-Awlaki that appear in the defendants' social media and Deleon's digital devices, including a passage of an Al-Awlaki lecture that can be heard in the video "The Light 46: The Black Flags of Khorasan" (Exhibit 215), which, as discussed above, both Kabir and Deleon posted online in December 2011 (Exhibits 486, 712; 9/9/14 RT AM Session at 35-42). Kohlmann also discussed another of Al-Awlaki's lectures appearing in the evidence, "The Battle of the Hearts and Minds," in which Al-Awlaki argues that violent jihad is an essential part of the Muslim faith. (Id. at 43).

At trial, defense expert Dr. Marc Sageman corroborated much of Kohlmann's testimony. Among other things, Dr. Sageman confirmed the jihadi movement's antipathy toward the West, including Bin Laden's and Al-Qa'ida's declarations of war against the United States. (9/10/14 RT AM Session at 66-70). According to Dr. Sageman, "the main objection" underlying Al-Qa'ida's calls for war against Americans was the United States' presence on Saudi soil, the land of the two holiest cities in Islam. (Id. at 66). Dr. Sageman acknowledged that, since the U.S. invasions of Afghanistan and Iraq, the Al-Qa'ida movement had flourished. (Id. at 70-71). According to Dr. Sageman, neo-jihadis viewed the calls by Al-Qa'ida to fight off

18

1   the American occupiers in Afghanistan and Iraq as religiously

2   obligatory calls to jihad.  (9/10/14 RT AM Session at 89-90).

3        It was precisely this global jihadist movement's fight against

4   the United States and others that the defendants sought to join here.

5   Their agreement to do so — and to fight and kill on the battlefield —

6   was undertaken in retaliation for the conduct of the United States

7   and its allies, specifically in occupying Muslim lands in

8   Afghanistan, Iraq and elsewhere and the perceived oppression of

9   Muslims, and was intended to affect the government conduct by

10  attacking, demoralizing, and driving out the occupiers.

11       **B.   A 420-Month Sentence Represents An Appropriate Variance**

12       The government's recommended sentence of 420 months varies

13  downward from the guidelines range of life, recognizing in part the

14  nature of the offenses and Kabir's personal history and

15  circumstances.  The Probation Officer's recommendation does the same.

16  See Revised Rec. Letter at 1.  No further variance is appropriate.

17       **C.   The § 3553 Factors Support A Sentence Of At Least 35 years**

18            1.   Kabir's Offenses Were Extremely Serious

19       The applicable Guidelines' range of life illustrates the

20  seriousness of the offenses here.  Terrorism offenses represent a

21  particularly grave threat "because of the dangerousness of the crime

22  the difficulty of deterring and rehabilitating the criminal." United

23  States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003).  Thus, Congress

24  and the Sentencing Commission were right to conclude "that terrorists

25  and their supporters should be incapacitated for a longer period of

26  time." Id.  The Ninth Circuit, when reversing a substantively

27  unreasonable sentence in a terrorism case for the second time,

28  expressly shared a similar concern raised by the Eleventh Circuit:

19

[a]lthough recidivism ordinarily decreases with age, we have rejected this reasoning as a basis for a sentencing departure for certain classes of criminals, namely sex offenders. We also reject this reasoning here. "Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."

Ressam, 679 F.3d at 1090 (quoting Jayyousi, 657 F.3d at 1117) (emphasis added).

Kabir's crimes, and particularly, his role in introducing to Deleon and Santana to the views of radical ideology calling for violent acts against the West, encouraging the co-defendants to engage in such violent acts, and instructing them on how to do so, were extremely serious.  Indeed, as noted, Kabir's pivotal role and participation in the conspiracy cannot be overstated, as he was involved in the all aspects of the group's plans and was, in fact, the person who instigated the conspiracy.

As previously discussed, Kabir was the person who was responsible for introducing violent and radical Islamic ideology, including those espoused by Anwar Al-Awlaki, to Deleon and Santana. Kabir was also the primary impetus for encouraging them to travel to Afghanistan to engage in violent jihad.

In addition, Kabir acted on his expressed desires to travel overseas when he left the United States for Afghanistan in 2011. And, while he was there, he encouraged Deleon and Santana to join him in Afghanistan by inviting them to "come down," assuring that they would be taken care of when they arrived there, discussing with the group his contacts with the Taliban and Al-Qa'ida and discussing specific travel and living arrangements.

Nonetheless, Kabir has argued in previous filings with the Court that the government failed to introduce evidence that he personally participated in paintball activities and firing ranges, and therefore, unlike the co-defendants, he had no intent to commit acts of violence or kill others.  The mere fact that Kabir was not physically present at paintball ranges or training with assault rifles with the co-defendants is immaterial, for several reasons.

First, the reason he did not participate in those activities was because he had already departed the United States for Afghanistan in 2011.  Second, and more importantly, it was Kabir who encouraged and instructed the group to engage in many of the specific acts of preparation that the co-defendants engaged in.  Third, the instructions that Kabir gave the co-defendants involved not only going to paintball and firing ranges; as noted, Kabir was involved in all aspects of the group's plans, including providing instructions for financing the trip to Afghanistan (<u>i.e.</u>, by selling Deleon's car), discussing various terrorist groups to join and the contacts Kabir had in those groups, as well as "missions" and "operations" that demonstrated that fighting was active in the areas they planned to travel to, and discussing travel logistics and living arrangements.

Finally, in considering the seriousness of the offense, it is important to again highlight the fact that, at bottom, the underlying objective of Kabir's plan was to join the Taliban and Al-Qa'ida to <u>fight</u> and <u>kill</u> U.S. and other military personnel.  Even among the vast array of federal crimes, the offenses for which Kabir was convicted of are the most serious.

2.   <u>Kabir's Criminal Conduct In this Case is Consistent with his Pattern of Disrespect for the Law and a Lengthy Sentence is Required to Deter Him from Committing Similar or More Serious Crimes in the Future</u>

The government's request for a term of imprisonment of 420 months also takes into account Kabir's history and characteristics. In addition to the seriousness of the offense and the pivotal role he played in the conspiracy, the sentence here should also promote respect for the law and provide for adequate deterrence against future criminal conduct, given that Kabir has demonstrated a repeated disregard for the law.  Indeed, Kabir's disrespect for the law continued even after he was arrested on the charges in this case.  As noted in the revised letter regarding sentencing, while Kabir was in BOP custody, he sustained several disciplinary actions, including for assaulting another inmate, unauthorized telephone use and mail abuse.

Moreover, with regards to Kabir's history and characteristics, the R-PSR includes information provided by Kabir about his difficult upbringing, medical conditions and history of substance abuse.  R-PSR ¶¶ 71-102.  As an initial matter, it is important to note that many of the facts provided by Kabir (which are plainly self-serving) are contradicted by the evidence introduced by defense witnesses at trial.

For example, contrary to the characterization that Kabir was a medically-impaired individual, a defense witnesses testified at trial that, when Kabir stayed with her family in Germany, he was a strong young man who, among other things, was able to work, navigate public transportation and walked a significant distance to attend classes. (9/11/14 AM Session RT at 19).  The R-PSR also noted that Kabir reported that he liked to live in Germany and wanted to find out how

to stay there.  R-PSR ¶ 74.  However, that too was contradicted by the record.  Kabir's relatives who lived in Germany testified that after he arrived in Germany in 2011, he made no meaningful attempts to extend his visa, despite being counseled by his family members about how to do so.  (9/10/14 PM Session RT at 35.)  Another family member testified that she had a Facebook conversation with Kabir in October 2012 (when he had already encouraged the co-defendants to join him in Afghanistan) and Kabir said that Germany was not a good place for him to live.  (9/9/14 PM Session RT at 70.)

In any event, to the extent there are factual discrepancies in the R-PSR, the Court need not resolve them for purposes of determining the appropriate sentence for several reasons.  First, as the Court noted on several occasions, whether or not Kabir may have had low intelligence, prior medical issues or a difficult upbringing, those issues are irrelevant to whether Kabir had the ability to commit the charged offenses or distinguish between right and wrong.  Simply stated, none of the information about Kabir's history and characteristics excuse, condone or justify his plan to go to Afghanistan to join the Taliban and Al-Qa'ida and to kill U.S. Military Personnel, or his conduct in recruiting, encouraging and instructing the co-defendants to do so.

Moreover, it is important to note that both the government's and the USPO's recommended sentence of 420 months represents a significant departure from the advisory guidelines range of life imprisonment.  In fact, the USPO has specifically taken into account Kabir's self-reported history and characteristics in recommending a sentence of 420 months.  Thus, no additional variance is warranted, even when considering the background information provided by Kabir.

3.   <u>A Lengthy Sentence Is Required to Protect the Public and Deter Similar Crimes</u>

As Dr. Sageman testified at trial, "the greatest threat facing America today comes from terrorist wanna-be[]s who gather information on the Internet and dare each other to take action."  9/10/14 RT AM Session 79, 108.  This is particularly true as "those persons least likely to do harm individually are best able to do so collectively." <u>Id.</u> at 108.  In the terrorism context, the need to deter adherents of neo-jihadi and other violent ideologies from dangerously crossing the line between radicalization (merely embracing extremist doctrine) and mobilization toward violent action, whether individually or in groups, is stronger than in almost any other type of criminal case. The need is particularly acute where a defendant like Kabir not only chooses violence for himself but seeks to recruit others to join him.

In short, the 420 month sentence that the USPO and the government recommend properly accounts for seriousness of Kabir's conduct.  Further, the recommended sentence promotes respect for the law and protects the public from the continuing threat Kabir presents.

Lastly, the recommended sentence affords a measure of deterrence to others contemplating turning to violence in the sake of their beliefs.  A lesser sentence would reward Kabir's rationalizations for his behavior and undermine some, if not all, of the sentencing factors the Court must consider.  According, the recommended term is sufficient but not greater than necessary to achieve the objectives set forth in 18 U.S.C. § 3553.

## IV.   CONCLUSION

For the foregoing reasons, the government respectfully requests the Court impose a sentence of 420 months' imprisonment, followed by a lifetime of supervised release and a special assessment of $400.

Dated: February 9, 2015          Respectfully submitted,

STEPHANIE YONEKURA
Acting United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

_____/s/_____
SUSAN J. DE WITT
CHRISTOPHER D. GRIGG
ALLEN W. CHIU
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA