O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>      v.<br><br>(1) SOHIEL OMAR KABIR<br>(2) RALPH KENNETH DeLEON<br><br>            Defendants. | Case No. ED CR 12-00092-(B)-VAP<br><br>**ORDER DENYING DEFENDANT KABIR'S MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR NEW TRIAL (DOC. NO. 713)**<br><br>**[Motion filed on January 12, 2015]** |

The Court has reviewed the Motion for Acquittal or New Trial filed by Defendant Sohiel Kabir on January 12, 2015 (Doc. No. 713), as well as the Government's Opposition filed January 27, 2015 (Doc. No. 718), and Defendant Kabir's Reply filed February 2, 2015 (Doc. No. 732). After considering all the briefing as well as the arguments advanced at the hearing conducted on February 9, 2015, the Court DENIES the Motion.

# I.   BACKGROUND

The five-count Second Superseding Indictment charged Defendants Kabir and Ralph Deleon with (1) conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 2339A (Count One); (2) conspiring to provide material support and resources to Al Qa'ida, in violation of 18 U.S.C. § 2339B (Count Two); (3) conspiring to commit murder, kidnaping or maiming overseas, in violation of 18 U.S.C. § 956(a) (Count Three); (4) conspiring to receive military-type training from Al-Qa'ida, in violation of 18 U.S.C. § 371 (Count Four); and (5) conspiring to kill officers and employees of the United States Government, in violation of 18 U.S.C. § 1117 (Count Five).  Jury trial commenced on August 12, 2014.  On September 25, 2014, the jury returned verdicts of guilty on Counts One, Two, Four and Five against Defendant Kabir, and a verdict of acquittal as to Count Three.

# II.   LEGAL STANDARDS

## A.   Motion for Judgment of Acquittal

Federal Rule of Criminal Procedure 29 provides that a court may set aside a guilty verdict and enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction.  Fed. R. Crim. P. 29(a), (c)(2).

In reviewing a post-conviction challenge to the sufficiency of the evidence, the court must first "consider the evidence presented at trial in the light most favorable to the prosecution." United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). Next, "after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" Id. (emphasis in original) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). The Court must resolve conflicting evidence in favor of the jury's verdict, and draw all reasonable inferences in favor of the government. United States v. Corona-Verbera, 509 F.3d 1105, 1117 (9th Cir. 2007) (citations omitted).

In performing this analysis, the court "may not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt,' only whether '*any*' rational trier of fact could have made that finding." Nevils, 598 F.3d at 1164 (quoting Jackson, 443 U.S. at 318-19) (citation omitted) (emphasis in original). Further, it is the exclusive province of the jury "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.

**B.   Motion for New Trial**

Rule 33 permits the court to grant a defendant's motion for new trial when the "interest of justice so requires." Fed. R. Crim. P. 33(a).  "A district court's power to grant a motion for new trial is much broader than its power to grant a motion for judgment of acquittal."  United States v. Alston, 974 F.2d 1206, 1211 (9th Cir. 1992) (citations omitted).  Although the decision on a motion for new trial is entrusted to the sound discretion of the trial court, the discretion is not unconstrained and a new trial may only be granted if "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred."  United States v. Kellington, 217 F.3d 1084, 1097 (9th Cir. 1985) (citations omitted).

## III.   DISCUSSION

**A.   Motion for Judgment of Acquittal**

Kabir's Motion recites the evidence introduced at trial that was favorable to the defense's theory of the case, e.g., that Defendant Kabir was, in his counsel's description, merely a "pothead from Pomona."

The question before the Court is not, however, whether there was conflicting evidence for the jury to resolve, nor whether there was sufficient evidence to support the defense's interpretation of the evidence, or to uphold a judgment of acquittal.  Instead, the Court's task on a

motion for a judgment of acquittal is to determine whether, considering the evidence as a whole, interpreted in the light most favorable to the Government, a rational trier of fact could have convicted the defendant. In order to answer that question as to each of the four counts on which the jury convicted Defendant Kabir, the Court cannot confine itself to examining the evidence adduced by the defense, as its motion suggests, nor may it draw inferences in favor of the defendant.

### 1. Count One: Conspiring to Provide Material Support to Terrorists

As to this count, the jury convicted Defendant Kabir of conspiracy to provide material support or resources, namely themselves as personnel, as to two predicate offenses, 18 U.S.C. section 956(a) and 18 U.S.C. section 2332(b). The jury was instructed that personnel was defined as one or more persons, which could include the defendant. In attacking his conviction on Count One, Kabir argues the Government failed to satisfy its burden of proving beyond a reasonable doubt that he personally had the intent to kill. That is an incorrect understanding of the law. The jury did not have to find, nor did the Government have to prove, that the defendant himself was one of the personnel offered in material support. In other words, the Government did not have to prove Kabir had the intent to kill; it was sufficient that it proved he conspired with at

least one other person to join him in Afghanistan for the
purpose of providing material support to terrorists.

The elements of the conspiracy charged in Count One are
(1) an agreement between two or more persons to provide
material support or resources, namely, themselves as
personnel; and (2) the defendant became a member of the
conspiracy knowing of its object and intending that such
support and resources be used in preparation for, or in
carrying out, one or more of three enumerated offenses.
(As just described, Defendant Kabir was convicted of
conspiracy as to two predicate offenses, sections 956(a)
and 2332(b).)

Defendant Kabir argues that the Government failed to
meet its burden of proof that he entered into an agreement
with the codefendants, and that he had the requisite
intent. He is incorrect on both points.

According to the defense, although Defendants Deleon,
Santana and Gojali conspired, the Government failed to
introduce sufficient evidence that Kabir was a member of
any of the charged conspiracies. The trial record belies
that contention. The Government presented the jury with
evidence that Defendants Kabir, Santana and Deleon began
planning to engage in violent jihad soon after they met in
late 2010. (Trial Exhibits ("Tr. Exhs.") 527, 655.) As

part of the plot, Kabir planned to relocate to Afghanistan (Tr. Exh. 588), and once there after a brief stay in Germany, the other defendants and coconspirators planned to join him in order to engage in violent jihad. Kabir had introduced codefendant Deleon to Islam, but more importantly, he introduced him to the teachings of Anwar Al-Awlaki, the cleric who preached to his followers they had a duty to engage in armed conflict against the United States and other Western powers. (Tr. Exhs. 516, 519, 569, 575, 593.) Kabir posted many of Al-Awlaki's violent videos on his Facebook page (Tr. Exh. 88), and in particular, he posted the Du'a of Sheikh Mohaisany calling on Allah to destroy the United States. Kabir labeled this a "powerful prayer" (Tr. Exh. 224.7); Deleon "liked" this post. The defendants formed the initial contours of their agreement to engage in violent jihad outside the United States before Kabir left the country, as shown by the recorded statements of the defendants themselves (Tr. Exhs. 580, 588-91), including those from Deleon to the confidential informant ("CI") describing the plan (Tr. Exhs. 588, 596), and Defendant Gojali's trial testimony on the same subject.

Gojali testified he met Kabir, Deleon, and Santana at the Al-Sabreen mosque in Pomona in 2011, and during their initial discussion, Kabir and the others immediately began telling him he should leave the United States. His first impression was that Kabir was an extremist. Shortly after

that, Deleon introduced him to photographs, videos and recordings of Al-Awlaki, as well as _Inspire_ magazine. Gojali developed the intention to travel with the others to go and fight, and to engage in jihad; specifically, the intention was to join Kabir in Afghanistan to fight American soldiers, as well as British, Australian and U.N. forces there. (Doc. No. 649 (Trial Transcript 9/16/14).)

The Government introduced evidence of Kabir's instructions to the others on how to train and prepare to commit violent jihad. These instructions were detailed and specific: the codefendants were told to work out, and in particular to concentrate on hiking and other activities and exercises designed to prepare for travel in the Afghan terrain as well as carrying weapons and perhaps dead bodies. (_See, e.g._, Tr. Exhs. 95, 524, 617, 619, 669; Doc. No. 649.) Gojali and Deleon talked about killing American personnel; Gojali assured Deleon that he would kill a "girl" in U.S. army uniform; Deleon stated, "If they are fighting, you kill them," referring to U.S. personnel. (Tr. Exh. 531.) Kabir told the codefendants to train in using firearms, and they complied by going to shooting ranges and practicing with the types of weapons they expected to use in Afghanistan, and going to paintball ranges where they could practice fighting simulations. (Tr. Exhs. 96, 98, 516.) At Kabir's direction, they obtained visas and passports so they could travel to meet

him in Afghanistan. (Tr. Exhs. 545, 547, 549.)
Codefendant Deleon dropped out of college, obtained a
refund of his tuition, and sold his car to raise the
necessary money to buy the expensive air tickets to Turkey,
from where they intended to travel on to Afghanistan. (Tr.
Exhs. 549, 563.) Kabir instructed them to fly through
Mexico to avoid calling attention to themselves (Tr. Exh.
519), and the jury heard the coconspirators make airline
reservations in compliance with that directive. Kabir
instructed them about what clothing and items to pack, and
what they could purchase more cheaply once they arrived in
Afghanistan. (Tr. Exhs. 540, 549, 563.) The Government
introduced evidence of Kabir telling the coconspirators
they would join the Taliban and eventually Al Qa'ida once
they arrived in Afghanistan, and would engage in violent
jihad with him.

The jury heard Kabir repeatedly assuring his
coconspirators he had arranged housing for them in Kabul.
(Tr. Exhs. 516, 519, 522, 535.) The Government also
introduced evidence of Kabir's repeated statements that he
was going to go on a "mission," that might be "one-way" (or
suicidal), and involve the explosive C-4. (Tr. Exhs. 535,
536, 548.)

The defense contends this evidence is insufficient to
uphold the jury's verdict. It argues, for example, that

Kabir's lack of intent was shown by evidence that he moved to Germany and tried to stay there. In fact, the evidence was conflicting as to whether Kabir really wanted to stay in Germany. First, the testimony the defense relies on was not from Kabir himself. Rather, it came from other witnesses, and was admitted only for a limited purpose, not for the truth of whether Kabir was indeed "happy" to stay in Germany. The Government presented evidence in an intercepted conversation between Deleon and the CI on May 26, 2012, when Deleon says that Kabir was in Germany *but is going to Afghanistan*. (Tr. Exh. 588.) The evidence from Kabir himself was that being in Germany was only a stopping off point before traveling to his ultimate destination, Afghanistan. He posted on his Facebook page in January of 2012 that he was not planning to return to the United States *and that in Germany he was halfway to his destination* – i.e., Afghanistan. (Tr. Exh. 221.) This was underscored by the testimony of another relative, Mohammad Sarwari, that Kabir made no efforts to remain in Germany. For example, Sarwari testified that Kabir never followed Sarwari's instruction to go to the Foreign Office if he wished to remain in Germany or take other steps to resolve his visa problems. Defendant's cousin, Haseena Harim, testified that Kabir declined her offer of a ticket to return home from Afghanistan, and that in September of 2012 Kabir told her he was comfortable in Kabul and it was better than the United States; a week later he told Harim

he was never coming back to live in the United States and that Germany was not a good place for him to live. Even to the extent that there was conflicting evidence regarding Kabir's intentions when he left the United States, "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven fact." <u>United States v. Rojas</u>, 554 F.2d 938, 943 (9th Cir. 1977).

The Motion also argues that the lack of any agreement between Kabir and the three codefendants was evidenced by his plan to leave Afghanistan for Turkey with his family members. Again, there was evidence at trial that Kabir intended to stay in Afghanistan after his family members left for Turkey, including Kabir's own statements to his codefendants that there would be a place for them to stay with him in Kabul once his family departed. (Tr. Exh. 516 (Oct. 9, 2012 - Kabir tells Deleon his relatives are going to Turkey and Kabir will rent out their house for the coconspirators); Tr. Exh. 519 (Kabir tells Deleon about apartments he is thinking of renting if his relatives do not move); Tr. Exh. 528; Tr. Exh. 535 (Kabir tells Deleon that his relatives are moving, but the rent on their house is too high, so he found another apartment).) Even more importantly, the aunt with whom Kabir lived in Kabul, defense witness Najieh Sarwari, repeatedly and vehemently denied during direct examination by defense counsel that

Kabir was ever included or invited in her family's plans to travel and relocate outside Afghanistan.

The defense also contends that the Government failed to meet its burden of proof that Kabir entered into an agreement because the evidence showed he was "impaired, low functioning and fond of marijuana." First, there was no evidence presented that defendant Kabir was of such low intellectual function that he was incapable of entering into an agreement with his codefendants. Moreover, the jury heard evidence, including testimony from witnesses called by the defense, that Kabir was studying in Germany to obtain the necessary certification to teach English, and passed his examination to do so. The jury heard from Kabir's relatives that he was a "strong, healthy young man," and capable of walking long distances, using public transportation, and working. The defense introduced evidence that Kabir was forced to transfer high schools repeatedly, ending up in a continuation high school, and spent only six months in the United States Air Force before being discharged on a 10% disability, after which he lived with family members and was chronically unemployed. Hares Kabir, his brother, described Kabir as lacking initiative, and unable to follow through on any scheme for employment or making money. Although the Motion struggles to paint Kabir as so impaired and "low functioning" that he could not form the necessary intent, the jury heard the evidence

described above that his family wanted him to move to Germany in the hope he would learn to be independent and support himself, that he studied for and passed a teaching examination, and that the relatives with whom he lived viewed him as healthy and strong. And the jury heard dozens of recordings of Kabir himself, discussing detailed plans with the other defendants, and saw his writings, giving further opportunity to assess his ability to form the requisite intent. Finally, at the hearing on this Motion, Kabir's counsel repeatedly claimed the evidence showed that Kabir "panicked" when the other defendants were ready to depart the United States to join him in Kabul, and this illustrated that Kabir was all talk and no intent. The evidence the defense cited for this "panic" was a reference by Deleon in an intercepted conversation to the CI that he had "a feeling like [Sohiel] don't wanna go with the group anymore." (Tr. Exh. 567 at 5.) In the first place, this is far from enough to support an inference that Kabir had "panicked." More importantly, however, as the Government pointed out, immediately after that same conversation, Deleon followed up by telling the CI he had confronted Kabir about this "vibe" he had gotten, and Kabir said, "[O]h no no. It's not that. You guys are just stressing out, ya know. . . . [H]e was like, I feel like you guys are wasting money. You guys are wasting time." Id. There was ample evidence to support the jury's finding as to both elements of the charged offenses, and the Court

will not disturb the jury's resolution of conflicting evidence and testimony.

Next, the defense complains that the Government failed to provide evidence to support Kabir's statements to his coconspirators that he had found housing for them, that he knew someone in Dubai who could help with visas, that he could send phony wedding invitations, that he actually planned to go on one or more "missions," or that he actually had "connections" through which he could introduce the others to the Taliban or Al Qa'ida. This argument suffers from several flaws.

First, it overlooks that these statements were Kabir's own, made during Skype conversations and in email and other writings with the coconspirators. As such, they were admissions on the part of Kabir. And for example, Kabir's claim that he had arranged housing for his coconspirators in Kabul was substantiated by the evidence that his family, in whose house he was living in Kabul, was soon to leave for Turkey, making room available for the coconspirators. Perhaps most importantly, though, any tendency on Kabir's part to exaggerate his connections, his abilities, and his own willingness to undertake a suicide mission, is irrelevant. The Government produced sufficient evidence that the defendants, including Kabir, entered into an agreement, and Kabir entered into the conspiracy with the

requisite intent. To illustrate, three persons who plan with a fourth to commit a takeover bank robbery might hear details from that fourth person, who claims to have inside information about the layout of the bank, the location of the vault, and the amount of money likely to be available on the date planned for the robbery. The four take certain steps, including purchasing ski masks, disguises, bags to carry the loot, guns, and a getaway car, and head for the bank on the appointed day. That the fourth would-be robber is in fact exaggerating his "inside" knowledge does not defeat a finding of guilt on a conspiracy charge as to all four, who have entered into an agreement to rob the bank and taken overt acts to carry out the crime.

None of the other arguments are persuasive either. The defense also cites the Government's failure to arrest Kabir earlier or to conduct surveillance on him while he was living in Afghanistan. The pace and progress of the investigation does not undercut the evidence presented at trial here.

Defendant relies on the decision of the district court in the Southern District of New York in United States v. Valle, 301 F.R.D. 53 (S.D.N.Y. 2014) in vain. In Valle, the defendant "met" his alleged co-conspirators on a "fantasy sexual fetish website." Id. at 59. His profile page for the website emphasized, "I like to press the

envelope but no matter what I say, it is all fantasy." _Id._
The Government relied on Valle's internet communications
with other users of the website – which involved him
transmitting Facebook photographs of women he knew and whom
he wanted to commit acts of sexual violence against – to
charge him with, _inter alia_, conspiracy to commit
kidnaping. _Id._ But none of the conspirators, "ever met or
took steps to meet, nor did they ever speak by telephone."
_Id._ at 60. They only ever chatted on the Internet. _Id._
("This is a conspiracy that existed solely in cyberspace.")
There was "no evidence that the alleged conspirators ever
exchanged telephone contact information or accurate
information about the area in which they lived, or that
they ever knew or sought to learn each other's true
identities." _Id._ They communicated with each other
infrequently, with months passing between chats. _Id._
"[N]o real-world, non-Internet-based steps were ever taken
to kidnap anyone." _Id._ "While the alleged conspirators
discussed dates for kidnapings," those dates came and went
without any kidnaping, and "without comment, without
discussion, without explanation, and with no follow-up."
_Id._

Unlike Valle, Kabir not only met Deleon in person, he
converted Deleon to Islam, introduced him to the violent
teachings of Anwar Al-Awlaki, encouraged him to come to
Afghanistan to engage in violent jihad and gave him

16

detailed instructions about preparing for that goal –
instructions that Deleon and the other coconspirators
followed by training with AK-47 weapons, and purchasing
airline tickets, for example.  At no point did Kabir's
Facebook or other Internet communications suggest his
desire to engage in terrorist activities was a mere hoax or
some sort of fantasy role-play.  He and the other co-
conspirators not only text-chatted over the Internet, they
met and discussed their plans over Skype.  They saw each
other's faces and knew each other's true identities.  They
communicated often, at one point setting out a plan to talk
on Skype weekly.  Moreover, as the Government correctly
points out, the jury heard evidence, including testimony
that – at Kabir's direction – the defendants took real-
world steps and prepared for combat through physical
training regimes and firearms practice; obtained the
necessary travel documents to travel to Afghanistan;
purchased airfare and were en route to Afghanistan when
apprehended; immersed themselves in the teachings of Anwar
Al-Awlaki regarding the duty to kill American personnel in
Afghanistan; and discussed the particular roles they wanted
to play in combat against American forces.  Kabir directed
them in detail about how they were to prepare, how to pack
and what they were to bring to Afghanistan, down to
instructing them to get and bring his old U.S. service
uniforms – which might be useful in gaining access to U.S.
military bases in Afghanistan.  Unlike Valle, who the court

emphasized had only engaged in fantasies of mutilation and killing, Kabir had traveled to Afghanistan, instructed the other conspirators on their preparation for engaging in violent jihad, and encouraged and directed the other defendants to join him, culminating in their arrest with travel documents and airline tickets in hand and en route to the airport. And while certain dates came and went, like the date Kabir had said he was going on a one-way, suicide mission, such dates did not pass without comment. (See Motion at 10-11.) This evidence is a far cry from that described in Valle: emails and chats from an internet fantasy site but nothing further.

The Court has reviewed the evidence admitted at trial in the light most favorable to the Government, and has concluded there was sufficient evidence to allow a rational trier of fact to find both essential elements of the crime charged in Count One.

**2. Counts Two and Four: Conspiring to Provide Material Support to and Receive Military-Type Training from Al Qa'ida**

The elements of the offense charged against Defendant Kabir in the second count in the Second Superseding Indictment are: (1) an agreement existed between two or more persons to provide material support or resources, namely themselves, to a designated foreign terrorist

organization ("FTO"); (2) the defendant became a member of
the conspiracy knowing of its object and intending to help
accomplish it; (3) Al Qa'ida was a designated FTO; and (4)
Defendant was a national or lawfully admitted permanent
resident of the United States or the offense occurred in
whole or in part in the United States.  Defendant Kabir
does not challenge the sufficiency of the evidence as to
the third and fourth elements.  The elements of the offense
charged in the fourth count are (1) an agreement existed
between two or more persons to receive military-type
training from, or on behalf of, Al Qa'ida; (2) the
defendant became a member of the conspiracy knowing of its
object and intending to help accomplish it; (3) the
defendant knew Al Qa'ida was a designated FTO; (4) the
defendant was a national or lawfully admitted permanent
resident of the United States; and (5) one of the
coconspirators performed an overt act for the purpose of
carrying out the conspiracy.

    As to Kabir's attack on the first and second elements
of the second and fourth counts, much of the evidence
reviewed above as to Count One supports the jury's finding
that such an agreement existed between Kabir and the other
defendants to provide material support and resources to Al
Qa'ida, and to receive military-type training from or on
behalf of that group.  In particular, the conversations and
other communications between the defendants reveal their

plan to travel to Afghanistan for the purpose of joining Al Qa'ida to engage in violent jihad. In a conversation on August 31, 2012, for example, Kabir specifically discussed with coconspirator Gojali and the CI the process of joining Al Qa'ida and how the introductions of the coconspirators would be accomplished by him because he was the one with the "connections." Other conversations between the conspirators confirm this intent, including Santana's statement on July 11, 2012, that he would prefer to go to Afghanistan for training and fighting with Al Qa'ida. (Tr. Exhs. 583, 599.) Deleon and Santana explained to the CI that their intent was to first be in Taliban camps and then go to Al Qa'ida camps to "train with them." In a conversation on October 20, 2012, amongst the coconspirators, Kabir told them he had "connects" with Al Qa'ida and directed them to discuss about "one or the other," to which codefendant Santana responded, their "possibilities are not limited." (Tr. Exh. 526.)

The evidence discussed above, including Kabir's directions to the other coconspirators regarding physical training, the type of training they would receive in Afghanistan, and his own connections and "missions," all support a conclusion by the jury that these agreements existed, and that Kabir entered into them knowing of their objectives and intending to accomplish them. There is also ample evidence that at least one of the conspirators

performed an overt act – for example, the purchase of the airline tickets for the trip to join Kabir, the excursions to the shooting ranges to practice shooting AK-47s – the type of weapons they expected to use in fighting in Afghanistan – and engaging in specific training exercises recommended by Kabir so that they would, for example, be strong enough to carry bodies off the battlefield. Furthermore, there were specific statements by the coconspirators regarding the military training they wanted to receive; Deleon said he wanted to be on the front lines or involved with explosives, and Santana said he wanted to be a sniper. (Tr. Exh. 583.)

### 3. Count Five: Conspiring to Murder Officers and Employees of the United States

The elements of Count Five charged in the Second Superseding Indictment are: (1) beginning on or about August 2010 and continuing up to and including on or about November 16, 2012, an agreement existed between two or more persons to murder officers or employees of the United States while such officers or employer was engaged in or on account of the performance of his or her duties; (2) the defendant became a member of the conspiracy knowing of its object and intending to help accomplish it; and (3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy. After reviewing the evidence produced at trial in the light most

favorable to the prosecution, the Court has determined that this evidence is adequate to support a finding by a rational jury that each of the elements of the crime has been proved beyond a reasonable doubt.

Defendant Kabir repeatedly encouraged the codefendants to leave the United States and join him in Afghanistan in order to engage in violent jihad; and he directed them on the necessary preparations for engaging in battle. (Tr. Exhs. 516, 519, 527.) The codefendants undertook Kabir's directions and explicitly stated they were doing so in furtherance of the conspiracy to kill Americans: defendant Gojali told the jury that he intended to go to Afghanistan and use an AK-47 weapon to kill Americans; there was evidence that the coconspirators went to the paintball and firing ranges in order to train and prepare to engage in violent jihad; Deleon and Santana had conversations regarding their willingness to kill Americans in armed conflict. For example, on October 27, 2012, Gojali and Deleon talked about killing American personnel; Gojali assured Deleon that he would kill a "girl" in U.S. army uniform. Deleon stated, "If they are fighting, you kill them;" the logical inference to be drawn from the context is that he was referring to U.S. personnel. (Tr. Exh. 531.) On an earlier occasion, Deleon told Afman that his intent was "to give my life for Allah. And if the emir says, 'Look we need you to do a special ops . . . take out

that general because that general is a very good speaker he motivates a lot of kuffars, will you do it?' Ok, I'll do it." (Tr. Exh. 515.)

The Government met its burden of proof on all elements of Count Five.

**B.   Motion for New Trial**

As noted above, the Court's power to grant a defendant's request for a new trial is broader than that accorded it to grant a judgment of acquittal. In reviewing a motion under Rule 33, for example, the Court can weigh conflicting evidence and rely on its own judgment regarding the credibility of witnesses who testified at trial.

The Court has conducted this broader inquiry in considering Kabir's motion for a new trial. In particular, it found defendant Gojali to be a credible witness whose testimony was compelling. Gojali assisted the Government and hopes to receive a favorable sentencing recommendation from it, a consideration the Court bears in mind. It also notes, however, that Gojali expressed remorse and a desire to accept responsibility *immediately* upon apprehension – at the very earliest opportunity, before he could have had any true understanding of the benefits of doing so.

In considering the testimony of many of the defense witnesses, including Hares Kabir, and his aunt and cousin, the Court found they too were credible witnesses. Their testimony often was not helpful to the defense, as noted above, however. In sum, considering the evidence as a whole, the Court is not persuaded that the evidence weighs so heavily against the verdict that a serious miscarriage of justice may have occurred in this case. Hence, it DENIES the Motion for New Trial.

**IT IS SO ORDERED.**

Dated: <u>February 13, 2015</u>    _____
                                           VIRGINIA A. PHILLIPS
                                    United States District Judge